IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RICHARD HOBBS, | ) | Case No. 5:18-cv-446 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Richard Hobbs, seeks judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. This matter is before the court pursuant to 42 U.S.C. § 405(g) and 1383(c)(3), and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  ECF Doc. 12. Because the ALJ applied proper legal procedures and reached a decision supported by substantial evidence, the Commissioner's final decision denying Hobbs' applications for supplemental security income and disability insurance benefits must be AFFIRMED.

## II.      Procedural History

On December 19, 2014, Hobbs applied for supplemental security income and disability benefits.  (Tr. 263–72).  Hobbs alleged that he became disabled on June 16, 2010, due to "arthritis, hearing loss in both ears/wears hearing aids, rotat[o]r disc both shoulders, hep[atitis] C with liver damage, knees give out, [and] immune system breaking down/low white blood

count."[1]  (Tr. 103, 118, 135–36, 149–50, 263, 267).  The Social Security Administration denied

Hobbs' claims initially and upon reconsideration.  (Tr. 103–32, 135–62).  Hobbs requested an

administrative hearing.  (Tr. 187–88).  Administrative Law Judge ("ALJ") Charles Shinn heard

Hobbs' case on November 10, 2016, and May 1, 2017, and he denied the claim in a May 17,

2017, decision.  (Tr. 15–46, 54–71, 73–102).  On January 17, 2018, the Appeals Council denied

further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1–6).

On February 26, 2018, Hobbs filed a complaint to seek judicial review of the Commissioner's

decision.  ECF Doc. 1.

## III.    Evidence

### A.      Personal, Educational and Vocational Evidence

Hobbs was born on September 8, 1964 and was 45 years old on the alleged onset date.

(Tr. 79, 263, 267).  He turned 50 years old on September 8, 2014.  Hobbs had a high school

education and past work as a lawnmower mechanic.  (Tr. 79, 350).

### B.      Relevant Medical Evidence

On December 23, 2010, Hobbs told Joshua Jacquet, M.D., at Akron General Medical

Center ("AGMC") that he was in pain after his knee "popped out" while he was loading logs

onto a truck.  (Tr. 602).  Hobbs reported that he had knee problems in the past, but it was never

painful.  (Tr. 602).  On examination, Hobbs' knee was not tender and did not have any other

observable issues requiring further evaluation.  (Tr. 602–603).  Dr. Jacquet determined that

---

[1] In his decision, the ALJ noted that Hobbs alleged mental impairments, including substance abuse disorder, depression, and intellectual disability that the ALJ found were non-severe; however, Hobbs has not raised any issues related to mental impairments before this court.  (Tr. 20–22); *see generally* ECF Docs. 14 and 17.  He also has not raised any issues related to his hearing impairments, ankle injury, or hepatitis.  *See generally* ECF Docs. 14 and 17.  Accordingly, any challenges to the Commissioner's decisions regarding Hobbs' mental impairments, drug abuse, hearing impairments, ankle injury, and hepatitis are waived.  *See Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517–18 (6th Cir. 2010) (noting that a plaintiff waives any argument not raised in his brief before the district court).

Hobbs' leg pain was due to a hamstring strain and that Hobbs was able to walk without difficulty. (Tr. 603). On December 27, 2010, Hobbs returned to AGMC and told Erin Simon, D.O., that he needed additional medications due to ongoing pain from his hamstring strain. (Tr. 597). Dr. Simon gave Hobbs two narcotic pain reliever pills and prescribed over-the-counter pain relievers to transition him off the narcotic pain reliever. (Tr. 598). Dr. Simon also offered Hobbs crutches, which he refused. (Tr. 598).

On May 23, 2011, Hobbs saw Jeanette Porubovich-Mizenko, M.D., at the VA, to establish care. (Tr. 570). He reported that he had a history of arthritis in his shoulders and back, for which he saw a chiropractor, took a narcotic pain reliever, and received steroid injections. (Tr. 570). Dr. Porubovich-Mizenko prescribed Hobbs an oral, non-narcotic pain reliever. (Tr. 573). Hobbs' treatment with Dr. Porubovich-Mizenko and other VA providers throughout 2011 was related to his alcoholism, hepatitis, and depression. (*See generally* Tr. 532–79). On May 3, 2011, Hobbs told his VA counselor that he worked enough to buy beer and cigarettes, and on June 13, 2011, he told his VA dietician that he did his own cooking and grocery shopping. (Tr. 508–09, 568). Hobbs did not see Dr. Porubovich-Mizenko from September 2011 until May 2013, when he requested placement in a detox program. (Tr. 526). On June 21, 2013, Hobbs told Dr. Porubovich-Mizenko that he had "sharp, shooting" pain in his left shoulder, that his shoulder was "frozen," and that he received injections from outside providers. (Tr. 519, 523). Dr. Porubovich-Mizenko noted additional injections or physical therapy might be helpful. (Tr. 519). She referred Hobbs to radiologist Craig George, M.D., for an x-ray of his left shoulder, which revealed mild degenerative changes in the joint at the top of his shoulder, but that his "shoulder [was] otherwise unremarkable." (Tr. 467). Hobbs did not follow up with Dr. George or Dr. Porubovich-Mizenko for treatment of his shoulder and back issues. (Tr. 512–17).

On July 2, 2013, Hobbs told Anna Sandhu, M.D., at Internal Medicine Center ("IMC") that he had pain and a limited range of motion in his left shoulder since May 2013. (Tr. 652). Hobbs told Dr. Sandhu that he took naproxen for pain relief. (Tr. 652). Dr. Sandhu noted that Hobbs had crepitus in his left shoulder, that his passive range of motion on reaching to the side was greater than reaching overhead, and that he did not have any pain reaching down. (Tr. 653). Dr. Sandhu referred Hobbs to physical therapy for evaluation and treatment. (Tr. 653). On July 23, 2013, Hobbs told Dr. Sandhu that his left shoulder pain was worse, but he was "doing fine still." (Tr. 649). Dr. Sandhu referred Hobbs to St. Thomas Hospital Orthopedic Clinic ("St. Thomas") for an MRI, instructed Hobbs to continue using naproxen, and reiterated her physical therapy referral. (Tr. 650).

On August 6, 2013, Hobbs had an MRI at St. Thomas, which showed a tear in his left shoulder muscle and osteoarthritis.[2] (Tr. 647–48). At a September 13, 2013, follow-up, Hobbs told Bradley Inkrott, M.D., that he had left shoulder pain for 6 months that became progressively worse. (Tr. 663). Hobbs told Dr. Inkrott that he worked as an auto mechanic, and that his inability to lift heavy objects or "do any sort of overhead activities" made his job difficulty. (Tr. 663). Hobbs told Dr. Inkrott that a steroid injection improved similar symptoms in his right shoulder. (Tr. 663). On examination, Dr. Inkrott noted that Hobbs had significant muscle atrophy, poor posture, tenderness, and resisted forward flexion in his left shoulder. (Tr. 663). Dr. Inkrott noted that an MRI and other images of Hobbs' left shoulder revealed a partial-thickness tear in a shoulder tendon, muscle atrophy, and a bone spur. (Tr. 663). Dr. Inkrott gave Hobbs a steroid injection, prescribed an anti-inflammatory medication, and

---

[2] Hobbs did not submit medical records from his August 2013 treatment at St. Thomas, but this treatment is noted in medical records from IMC. *See generally* Doc. 10, Page ID# 52–53; (Tr. 655–66).

referred Hobbs for physical therapy to strengthen his rotator cuff and shoulder muscles. (Tr. 663–64).

On May 12, 2014, Hobbs told Richard Gradsick, M.D, at AGMC that his right knee was painful and swollen after he rode his bike into a tree. (Tr. 582). Dr. Gradsick determined that Hobbs did not fracture his knee, but that he had an abnormal range of motion in it. (Tr. 583). Dr. Gradsick instructed Hobbs to follow up with Phillip Wilcox, M.D., or an orthopedic physician at the VA, placed Hobbs' knee in an immobilizer, and prescribed him a narcotic pain reliever. (Tr. 583). Dr. Wilcox determined that Hobbs did not have any significant joint line tenderness in his knees, but he had "some very mild" tenderness in the middle of his shin and "mild patellofemoral crepitus." (Tr. 590). Dr. Wilcox took four CT scans of Hobbs' knee, which showed degenerative changes including small joint effusion, mild osteoarthritis, mild soft tissue swelling in the kneecap, and a few loose bodies or bone spurs near his shin indicating a shin fracture. (Tr. 590, 592–95). Dr. Wilcox prescribed ice, elevation, immobilization, and crutches. (Tr. 590).

On November 4, 2014, Jonathan Kanam, D.O., at IMC noted that Hobbs had complained to Dr. Sandhu about shoulder pain in July 2013 and had an MRI at St. Thomas in August 2013. (Tr. 647). Hobbs told that he did not have any shoulder pain since his September 2013 steroid injection. (Tr. 647–48). At a follow-up on November 26, 2014, Hobbs told Jesson Baumgartner, D.O., that he had sharp pain in his left shoulder that started after he "la[id] some hardwood flooring." (Tr. 644). Hobbs told Dr. Baumgartner that Aleve and Advil gave him "mild relief," and he said that this was the first time he had pain since receiving a September 2013 steroid injection at St. Thomas. (Tr. 644). Dr. Baumgartner referred Hobbs to St. Thomas for further evaluation and treatment, prescribed an anti-inflammatory medication, and instructed Hobbs to "remain as active as possible with shoulder to avoid frozen shoulder." (Tr. 645). At a January 5,

2015, follow-up, Hobbs told Dr. Kanam that he had right shoulder pain and was scheduled to receive a left shoulder injection on January 7, 2015. (Tr. 641). Dr. Kanam did not note any abnormalities in Hobbs' extremities on examination but stated that he had a decreased range of motion in his back. (Tr. 641). Dr. Kanam stated that he would "inquire about [a right] shoulder injection," and instructed Hobbs to continue taking his anti-inflammatory medication. (Tr. 642). On August 1, 2016, Hobbs told Dr. Kanam that he had lower back pain after falling off a ladder, but he denied any weakness. (Tr. 853). Hobbs told Dr. Kanam that he self-medicated with Percocet that he had left over from dental surgery, and Dr. Kanam told him to stop. (Tr. 855). Dr. Kanam noted that Hobbs had a decreased range of motion and tenderness in his back on examination, recommended that Hobbs pursue conservative therapy, and continued Hobbs's Neurontin prescription. (Tr. 855).

On January 7, 2015, Hobbs told Inkrott that he had pain in both his shoulders. (Tr. 659). Dr. Inkrott noted that he had given Hobbs a shoulder injection a year and a half earlier, which Hobbs said gave him relief for "roughly 6–8 months." (Tr. 659). Dr. Inkrott also noted that he had prescribed physical therapy and an anti-inflammatory medication to treat his shoulder pain, but that Hobbs did not follow up on either. (Tr. 659). On examination, Hobbs did not have any changes in his extremities, and Dr. Inkrott gave Hobbs injections in both shoulders. (Tr. 659). Dr. Inkrott also repeated his physical therapy prescription. (Tr. 659). On May 6, 2015, Hobbs told Dr. Inkrott that his January shoulder injections gave him "pretty good relief" in his right shoulder that was "greater than [his] left shoulder." (Tr. 687). Dr. Inkrott gave Hobbs additional injections and stated that Hobbs "will continue physical therapy" and taking anti-inflammatory medication. (Tr. 687). On December 18, 2015, Hobbs told Dr. Inkrott that he had "mild relief" from over-the-counter pain medications and physical therapy and stated that he "sometimes work[ed] a labor related job." (Tr. 717). Dr. Inkrott noted that Hobbs had crepitus in his

shoulders and some limited forward flexion in his left shoulder; however, he had full strength. (Tr. 717–18). Dr. Inkrott stated that Hobbs had "no true weakness," but exaggerated his left shoulder pain on examination. (Tr. 718). Dr. Inkrott gave Hobbs shoulder injections and told Hobbs that his "problem [would] not improve unless he [made] a rehab effort, which to [that] point [had] been minimal." (Tr. 719). He also gave Hobbs literature on home exercises to improve rotator cuff strength and range of motion. (Tr. 720–26). On March 23, 2016, Dr. Inkrott's assessment of Hobbs' condition did not change, and he gave Hobbs additional injections. (Tr. 709–11, 779–80). Hobbs told Dr. Inkrott that he could not do home exercises as instructed because he did not understand what rotator cuff rehabilitation was, and Dr. Inkrott stated that Hobbs would need two to three months of intensive therapy to determine whether conservative management was effective. (Tr. 711, 781). Dr. Inkrott stated that he wanted Hobbs to give him physical therapy notes to verify attendance and that he would order x-rays if Hobbs' symptoms worsened or only marginally improved. (Tr. 711, 781). On August 17, 2016, Hobbs denied having any weakness in his shoulder, but said that he had pain with activity. (Tr. 765, 775). Dr. Inkrott noted that Hobbs had a poor history of compliance with rehabilitation and physical therapy, and that Hobbs had never given him any verification that he actually went to physical therapy. (Tr. 766, 775). Dr. Inkrott gave Hobbs additional injections and stated that Hobbs was a poor operative candidate due to his lack of rehabilitation effort. (Tr. 766, 777).

On January 14, 2015, Hobbs told Ryan Urchek, M.D., at St. Thomas that his right shoulder felt better after his injection, but that his left shoulder pain continued. (Tr. 656). On examination, Dr. Urchek noted that Hobbs had "much better" motion in his right shoulder than his left shoulder, and that Hobbs had pain with external rotation of his left shoulder. (Tr. 656). Dr. Urchek noted that he would not give Hobbs a second injection, as he had had one a week earlier, and instructed Hobbs to follow up after physical therapy. (Tr. 656). At a follow-up on

September 16, 2015, Hobbs told Dr. Urchek that, in addition to injections in both his shoulders, he had "mild relief" from over-the-counter pain medications and physical therapy. (Tr. 682). On examination, Dr. Urchek noted that Hobbs had crepitus in his shoulders and some limited forward flexion in his left shoulder; however, he had full strength. (Tr. 682). Dr. Urchek noted that Hobbs was doing well with conservative care and wished to proceed with it. (Tr. 683). Dr. Urchek gave Hobbs steroid injections in his shoulders and instructed him to continue home exercises. (Tr. 683).

On February 5, 2015, Hobbs went to physical therapist ("PT") Christ Perry for an assessment of his bilateral shoulder pain and plan for physical therapy. (Tr. 668–74). Hobbs told Perry that his January 7, 2015, injections gave him "good relief," and that he did carpentry on the side. (Tr. 671). Hobbs told Perry that his pain increased when he was active, and that the only thing that helped was injections. (Tr. 671). Perry noted that Hobbs had decreased range of motion, strength, and functional mobility. (Tr. 668, 673). Perry noted that Hobbs would need two months of physical therapy and a home exercise program, but that he expected poor compliance the home exercise program. (Tr. 668, 673). Perry stated that Hobbs's overall rehabilitation potential was poor. (Tr. 668, 673).

On March 23, 2016, Hobbs had an MRI, which revealed a full-thickness tear of a right shoulder tendon and mild fatty muscular atrophy. (Tr. 741). He also had severe tendinosis and interstitial partial tearing in another right shoulder tendon. (Tr. 741). His left shoulder had mild tendon weakness, "very slight" to minimal fraying, and mild to moderate tendinosis. (Tr. 739).

On April 28, 2016, Hobbs told Aaron Lear, M.D., that he "ha[d] trouble with Dr. Inkrott," felt worse after going to physical therapy, and was told to find a new doctor by his disability attorney. (Tr. 847). Hobbs told Dr. Lear that he took oxycodone "from wherever [he could] get it" (including oxycodone prescribed to his cousin), an anti-inflammatory medication,

and injections for his shoulder pain. (Tr. 847). Hobbs said injections did not help him. (Tr. 849). Dr. Lear noted that Hobbs had a normal gait and intact sensation in his upper extremities. (Tr. 849). Hobs refused further physical therapy, and Dr. Lear told Hobbs that he would not prescribe narcotic pain relievers. (Tr. 849). Dr. Lear noted that he was suspicious of Hobbs' complaints. (Tr. 849). On June 9, 2016, Dr. Lear gave Hobbs shoulder injections and told him that he would not get additional injections without physical therapy. (Tr. 842–43). Hobbs said that he would get physical therapy and did exercises at home, but he did not feel better. (Tr. 842).

On July 21, 2016, nurse practitioner ("NP") Christina Gabele noted that Hobbs had lower back pain with sciatica traveling down his left leg. (Tr. 729). Hobbs told Gabele that he could walk without difficulty, and that he did not have any weakness in his back. (Tr. 729). On examination, Gabele noted that Hobbs' back had a normal range of motion, was not tender, and had some pain on the left. (Tr. 730–31). Hobbs' upper extremities had a normal range of motion, and Gabele noted no abnormalities. (Tr. 731). Gabele determined that Hobbs had "mild multilevel spondylosis," and treated him for low back pain with sciatica. (Tr. 731). Gabele ordered imaging of Hobbs' back, which indicated that he had some bone spurs between his vertebrae, "mild multilevel lumbar spondylosis," and "trace" displacement of a lumbar vertebra. (Tr. 737). Gabele gave Hobbs an injection, prescribed a muscle relaxing medication, and instructed him to continue taking his anti-inflammatory medication. (Tr. 732).

On August 8, 2016, Hobbs told Dean Rich, D.O., that he had pain in his lower left back, which began after he fell off a four-foot ladder a month or two earlier. (Tr. 762). Hobbs said that he was prescribed Neurontin for his back pain. (Tr. 762). On examination, Dr. Rich noted that Hobbs had tenderness in his back and a decreased range of motion secondary to reported pain. (Tr. 763). Dr. Rich diagnosed Hobbs with a ligament sprain and sciatica, prescribed

Neurontin for the pain, and gave him an anti-inflammatory medication with no refills. (Tr. 763). On August 16, 2016, Hobbs told Dr. Rich that his back pain was much better, and Dr. Rich continued Hobbs' Neurontin and anti-inflammatory treatment. (Tr. 760). On September 13, 2016, Hobbs told Dr. Rich that his pain was worse with bending. (Tr. 758). Dr. Rich continued Hobbs' Neurontin, ordered an x-ray of Hobbs' back, and recommended that Hobbs get an orthopedic evaluation. (Tr. 759). On October 24, 2016, Hobbs told Dr. Rich that he was in physical therapy, and that his naproxen helped with his lower back pain. (Tr. 793). Dr. Rich continued Hobbs' medications and physical therapy recommendation. (Tr. 793–94). On January 5, 2017, Hobbs requested that Dr. Rich refer him to a chronic pain management specialist for management of his shoulder and lower back pain. (Tr. 887–88).

On August 11, 2016, Hobbs saw PT Perry for a physical therapy initial evaluation for treatment of his shoulder pain. (Tr. 829–32). Hobbs told Perry that a doctor recommended he have right shoulder surgery in April 2016, but he declined. (Tr. 830). He told Perry that he was in and out of therapy for the previous eight years, and that he also had back pain. (Tr. 830). Perry noted that Hobbs' physical therapy order was written in March 2016, and that Hobbs gave several excuses for not attending therapy sooner, including having dental work done and having a long waiting period for a second opinion. (Tr. 830). Hobbs told Perry that he rode his bike during the day, and that mowing grass did not bother his shoulders. (Tr. 830). On examination, Hobbs had moderate crepitus in his shoulders, +4/5 strength in his upper extremities, and some reduced range of motion. (Tr. 831). Perry noted that Hobbs had a history of noncompliance with doctors' recommendations, did not appear to be compliant with his current doctor's recommendations, and was given a home exercise program to perform. (Tr. 832). Perry discontinued services with Hobbs because he had an "apparent lack of motivation to perform therapy in an attempt to address his shoulder pain." (Tr. 832–33).

On September 22, 2016, David Rosenbaum, D.O., took x-rays of Hobbs' lower back. (Tr. 882). The x-rays showed that he had mild lumbar degenerative spondylosis. (Tr. 882).

On September 27, 2016, Hobbs told James Kennedy, M.D., that his back pain started a week after he fell from a three-foot ladder in June 2016. (Tr. 796). Hobbs told Dr. Kennedy that his prescribed pain reliever gave him relief, and that his symptoms were aggravated with lifting, walking, sitting, standing, changing positions, extended inactivity, and lying down. (Tr. 796). On examination, Dr. Kennedy noted that Hobbs could walk without difficulty and with a normal gait, appeared balanced, had full strength in his legs, and had normal sensation and reflexes in his back. (Tr. 798). Dr. Kennedy determined that Hobbs had degenerative disc disease in his lower spine with sciatica. (Tr. 798). Dr. Kennedy continued Hobbs on non-narcotic pain relievers and prescribed him an anti-inflammatory medication. (Tr. 798). On November 4, 2016, Hobbs told Dr. Kennedy that his back was 90% better with his medication and physical therapy, and that his pain was a 1/10. (Tr. 790, 802, 903). Dr. Kennedy's examination findings did not change, he instructed Hobbs to continue his medications and physical therapy, and he stated that Hobbs could proceed to home exercise after he finished physical therapy. (Tr. 792, 803–04, 904–05). On December 5, 2016, Hobbs told Dr. Kennedy that his aquatic therapy helped a lot, and that he could do normal daily activities without pain. (Tr. 901). On December 19, 2016, Hobbs told Dr. Kennedy that he aggravated his back pain when he was sanding a coffee table, and that he was in aquatic physical therapy. (Tr. 889, 898). On examination, Dr. Kennedy found that Hobbs had full strength in his lower back and lower extremities, but he demonstrated a shuffling gait. (Tr. 890, 899). On January 17, 2017, Hobbs told Dr. Kennedy that he had sharp back pain in the morning and was scheduled to begin pain management in February 2017. (Tr. 884, 893). On examination, Dr. Kennedy found that Hobbs had full strength in his lower back and lower extremities and a normal gait. (Tr. 885, 894–95).

Dr. Kennedy noted that Hobbs' "sciatica [was] about gone," and he prescribed a non-narcotic pain reliever. (Tr. 886, 895). On April 14, 2017, Hobbs told Dr. Kennedy that going to pain management was too inconvenient due to the bus schedule, and that his insurance denied a steroid injection. (Tr. 921). Hobbs told Dr. Kennedy that his prescribed narcotic pain reliever helped. (Tr. 921). On examination, Dr. Kennedy noted that Hobbs had full strength in his lower back but walked with an antalgic gait. (Tr. 922). He discussed operative treatment with Hobbs but decided to proceed with steroid injections. (Tr. 923).

On October 20, 2016, Hobbs saw PT Perry for a physical therapy initial evaluation for treatment of his lower back pain. (Tr. 823–26). Hobbs told Perry that he hurt his back when he fell off a ladder, and that he spent his day working on mowers in his garage, helping out at a local convenience store, and watching TV. (Tr. 823). On examination, Hobbs had an independent and normal gait, mild to moderate restrictions in his flexibility, 4/5 to +4/5 strength in his hips, full strength in his knees and ankles, poor posture, 25% range of motion in his standing spine, and 75% range of motion in his seated spine. (Tr. 824). Hobbs told Perry that steroids helped his pain and was prescribed therapy a month before his evaluation. (Tr. 825). Hobbs attended physical therapy sessions on October 27, 2016, November 3, 2016, and November 11, 2016. (Tr. 814–21). On November 11, 2016, Perry noted that Hobbs' progress was slow, he refused aquatic therapy for "several reasons," and he was not proactive enough with his rehabilitation. (Tr. 815). At a re-evaluation on November 17, 2016, Perry noted that Hobbs had improved, did not meet any of his objective goals, was independent in his home exercise program, and would go to another facility for aquatic therapy. (Tr. 810).

On November 14, 2016, Hobbs told Derek Klaus, M.D., that he was diagnosed with "bilateral massive rotator cuff tears," and that he received serial injections every few months for his pain. (Tr. 769). Hobbs said that he had difficulty performing overhead activities, but that his

pain was relieved with ice and activity. (Tr. 769). Hobbs also said that he was in physical therapy. (Tr. 769). On examination, Dr. Klaus noted that Hobbs had some reduced range of motion in his shoulders, 3/5 strength in his upper rotator cuff muscles, 4/5 strength in his middle and lower rotator cuff muscles, and full strength in his arms. (Tr. 772). Dr. Klaus noted that imaging showed early rotator cuff tear arthropathy, a massive rotator cuff tear on the left shoulder, and evidence of a high-grade tendon tear. (Tr. 772). Dr. Klaus gave Hobbs steroid injections in his shoulders and stated that Hobbs' rotator cuffs were likely not repairable due to the amount of atrophy and retraction shown in imaging. (Tr. 773). Dr. Klaus prescribed aquatic therapy at Hobbs' request. (Tr. 773). On February 13, 2017, Hobbs told Dr. Klaus that his symptoms had not changed, and that he had severe pain (6/10 to 8/10). (Tr. 914). Hobbs told Dr. Klaus that his injection helped for a few weeks, and that his physical therapy was helpful. (Tr. 915). Hobbs told Dr. Klaus that he wanted more injections, and that he was "not interested in having surgery because he [felt] that he [was] very functional [in] his current state." (Tr. 915, 918). On examination, Dr. Klaus found that Hobbs had a normal gait, full forward flexion in both shoulders, normal external rotation in both shoulders, and full strength in both shoulders. (Tr. 917).

On December 14, 2016, Hobbs saw Joshua Magleby, Ph.D., for a psychological evaluation on referral from the Division of Disability Determination. (Tr. 863–68). During the evaluation, Hobbs told Dr. Magleby that his daily activities included repairing lawnmowers that people brought him, watching TV, getting dressed, and bathing (but it hurt to shower). (Tr. 865). Hobbs said that he had trouble sleeping due to his shoulder pain. (Tr. 865).

On December 28, 2016, Charles Muncrief, D.O., examined Hobbs' knees and spine. (Tr. 874). Dr. Muncrief determined that Hobbs did not have any issues in his left knee, mild to

moderate degenerative changes in his right knee, and moderate multilevel degenerative changes in his lumbar spine.  (Tr. 874).

On February 2, 2017, Hobbs told Maged Fouad, M.D., that he had constant lower back pain that ranged from a 3/10 to a 10/10.  (Tr. 908).  He said that bending, standing a long time, lifting, sitting a long time, climbing steps, and cold made his pain worse.  (Tr. 908).  Hobbs said that he had modest relief from aquatic therapy, and that he had several lumbar injections in the past.  (Tr. 908).  On examination, Dr. Fouad found that Hobbs had normal range of motion in his spine, no trigger points, left joint tenderness, limited and painful bilateral shoulder abduction, very limited left shoulder flexion, normal left shoulder extension, and mildly limited right shoulder flexion and extension.  (Tr. 910).  Hobbs' right knee had limited flexion.  (Tr. 910). Dr. Fouad gave Hobbs a narcotic pain reliever for his lower back pain and referred Hobbs to a physical therapist for further evaluation of his back, knee, and shoulder problems.  (Tr. 911). On February 14, 2017, Joe Holcomb, M.D., interpreted x-rays of Hobbs' right knee to show mild to moderate degenerative changes in the knee joint, but no acute abnormalities.  (Tr. 881).

### C.    Relevant Opinion Evidence

#### 1.    Treating Physician—Steven Lippitt, M.D.

On July 11, 2016, Hobbs told orthopedic surgeon Steven Lippitt, M.D., that Dr. Lear requested he get a second opinion regarding treatment for his bilateral shoulder complaints. (Tr. 836).  Hobbs told Dr. Lippitt that steroid injections helped him, and that he did not go to physical therapy for his shoulder.  (Tr. 836).  Hobbs rated his shoulder pain as a 1 to 2 out of 10. (Tr. 836).  Hobbs said he used Percocet, which he "g[ot] from the street at times," and Dr. Lippitt encouraged him to stop.  (Tr. 836, 838).  On examination, Hobbs had a "mild neck ache" when reaching overhead, no shoulder pain on overhead reaching, no swelling, mild crepitus, mild tenderness, mild stiffness on cross-body reaching, good shoulder strength, 4/5 right rotator cuff

strength, 4+/5 left rotator cuff strength, and normal joint alignment. (Tr. 837). Dr. Lippitt noted that a May 2016 MRI showed a complete right rotator cuff tear and partial left rotator cuff tear. (Tr. 838). Dr. Lippitt encouraged Hobbs to avoid repeated steroid injections because they would defer any surgery and continued his anti-inflammatory medication. (Tr. 838). Dr. Lippitt stated that Hobbs should avoid pushing, pulling, or lifting more than 10 pounds with either shoulder. (Tr. 838).

## 2. Examining Physician—Mark Vogelgesang, M.D.

On December 28, 2016, Hobbs saw Mark Vogelgesang, M.D., for an orthopedic evaluation on referral from the Division of Disability Determination. (Tr. 869–78). Hobbs told Dr. Vogelgesang that he had 8/10 pain in his left shoulder and 3/10 pain in his right shoulder, both knees, and lower back. (Tr. 870). Hobbs also said that he could walk a half mile and carry and lift 10 pounds. (Tr. 870). Hobbs told Dr. Vogelgesang that he had trouble putting on shirts due to his shoulder pain, did a little cleaning, worked as a mechanic and a carpenter in the past, and could not lift anything overhead. (Tr. 870). Hobbs told Dr. Vogelgesang that a surgeon said he would not operate on his shoulder due to the extensive damage. (Tr. 873). On examination, Dr. Vogelgesang noted that Hobbs had an adequately aligned spine, intact range of motion in his spine and extremities, no joint erythema or tenderness, normal muscular development, full strength in all extremities, normal reflexes, and a normal gait without a limp. (Tr. 872). Hobbs had some tenderness at the top of his back, but he had "good lower back mobility." (Tr. 872). He had decreased shoulder mobility due to pain, could not lift his shoulders over his head, mildly affected internal rotation, good extension, abduction difficulty, good strength in his arms, and good mobility in the rest of his shoulder joints. (Tr. 872, 876). Dr. Vogelgesang rated Hobbs' shoulder strength as 4+/5 and noted that he did not have any muscle atrophy. (Tr. 875–76). Hobbs' knees did not have any crepitus, joint changes, or tenderness. (Tr. 872).

Dr. Vogelgesang diagnosed Hobbs with bilateral shoulder pain, history of low back pain, and history of bilateral knee pain. (Tr. 872). Based on the examination and a review of Hobbs' medical records, Dr. Vogelgesang opined that Hobbs could tolerate sedentary work. (Tr. 873). He stated that Hobbs might be able to tolerate light to sedentary work after his shoulder was examined further in March, and that physical therapy would possibly help resolve his left shoulder and allow him to do light to sedentary work. (Tr. 873).

### 3. State Agency Reviewing Physicians

On March 6, 2015, state agency consultant Paul Morton, M.D., evaluated Hobbs' physical abilities based on a review of the record. (Tr. 108–16, 123–30). Dr. Morton determined that Hobbs had medically determinable impairments, including osteoarthritis and degenerative disorders of the back. (Tr. 110, 125). Dr. Morton sated that Hobbs could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand or walk for 6 hours in an 8-hour day, sit for 6 hours in an 8-hour day, and push or pull without limitation. (Tr. 112, 127). Hobbs could never climb ladders, ropes or scaffolds, but he could frequently stoop, kneel, crouch, and crawl. (Tr. 112–13, 127–28). Hobbs had no limitation to his ability to climb ramps or stairs, handle, finger, feel, and endure cold, heat, wetness, humidity, vibration, and fumes. (Tr. 112–14, 127–29). Hobbs was limited to occasional bilateral overhead reaching. (Tr. 113–14, 128–29). Based on his findings, Dr. Morton opined that Hobbs could perform light work. (Tr. 115, 130).

On June 4, 2015, state agency consultant Anne Prosperi, D.O., reviewed Hobbs' medical records and concurred with Dr. Morton's findings. (Tr. 141–47, 155–61). Dr. Prosperi added that Hobbs could only occasionally crawl. (Tr. 144, 158).

### D. Relevant Testimonial Evidence

Hobbs testified at both the November 10, 2016, and May 17, 2017, ALJ hearings. (Tr. 79–92, 57–65). Hobbs testified that he lived at his mother's house with his uncle, and he

had three adult children who did not live with him. (Tr. 59–60, 81, 87). He did not have a bathroom on the floor of his mother's house, so he had to walk up and down the stairs two or three times per day. (Tr. 60). He last had a driver's license in 1996. (Tr. 59, 80). On a typical day he would watch TV, "mess around" in the garage, "tinker around with" and paint furniture, cook in the microwave, and do laundry. (Tr. 60, 87–89). He said it was difficult to reach back when he showered, and that reaching down while getting dressed and putting on a shirt hurt. (Tr. 90). Hobbs testified that he last worked in 2007, and that he worked for "about an hour or two" at Ring's Market in 2016. (Tr. 65). He said he did not work on lawnmowers. (Tr. 65).

Hobbs testified that he "sometimes" had lower back pain, which radiated down his legs when he stood for an hour and prevented him from walking. (Tr. 83, 88, 91). Hobbs said that his back pain got worse between the November 2016 and May 2017 ALJ hearings, but he no longer had pain raiding down his legs. (Tr. 58, 61). He could stand for about an hour, sit for a half hour, and walk a quarter mile. (Tr. 62). Hobbs said he had constant pain in his shoulders (worse in his left than right), which caused him difficulty sleeping. (Tr. 58, 63, 81, 83, 85). He said he could "sometimes" lift his arms over his head but that lifting as much as a gallon jug hurt. (Tr. 84, 89). Hobbs said that he could move something in front of him without difficulty, but that it hurt to reach. (Tr. 86). He had a torn left rotator cuff that hurt worse than his right shoulder, and his doctors told him he needed surgery on his right rotator cuff. (Tr. 82). At the May 2017 ALJ Hearing, Hobbs said that he could not do anything with his left arm due to his shoulder pain. (Tr. 59). Hobbs also stated that he also had knee pain sometimes. (Tr. 63).

Hobbs testified that he did physical therapy for his lower back pain, which he said his doctors wanted him to complete before he got therapy for his shoulders. (Tr. 82–84). Hobbs said that he was in physical therapy for his shoulders, but his physical therapist cancelled services because "it wasn't' doing no good" and "they want[ed] to do a[n] operation on [his]

right [shoulder]." (Tr. 85). Hobbs said that he did not tell his doctor he was not interested in surgery. (Tr. 64). Hobbs took Naprosyn and gabapentin for his pain, which helped "a little bit," but made him feel tired and dizzy. (Tr. 81, 84). He also got steroid injections every three months, which helped with the throbbing pain in his shoulders for "a couple weeks." (Tr. 58, 85, 90). Even with injections, moving his arms hurt. (Tr. 90). Nonetheless, he said that he could lift 10 pounds after his injections and more than 10 pounds "very little." (Tr. 63). Hobbs also got steroid shots for his back, which helped "a little bit." (Tr. 61).

Lynn Smith, a vocational expert ("VE"), testified at the November 10, 2016, ALJ hearing. (Tr. 94–99). Smith testified that Hobbs did not have any skills from prior work that would transfer to light or sedentary work. (Tr. 95). The ALJ asked Smith whether a hypothetical individual who was born in September 1964, had a high school education, and no relevant skills from past work could work if he could:

> Lift, carry push, and pull 20 pounds occasionally and 10 pounds frequently. This person can sit for six hours; stand and/or walk for six hours in a normal work day. This person cannot climb ladders, ropes, or scaffolds. This person can occasionally kneel and crawl. This person cannot reach overhead bilaterally. This person must avoid work place hazards, such as unprotected heights or exposure to dangerous moving machinery. This person[ is] limited to occasional interaction with others. And this person is limited to work settings that involve no more than moderate sound level, which I'll describe as a business office where typewriters are used, department store, grocery store, light traffic situations, or the noise level in a fast-food restaurant during off hours.

(Tr. 96). Smith testified that such an individual could work as a ticket marker, office helper, and office cleaner. (Tr. 96–97). The ALJ asked if the above-described individual could work if he were additionally limited to occasional reaching in other directions with no overhead reaching. (Tr. 97). Smith testified that such an individual could not work. (Tr. 97). The ALJ asked if the individual described in the first hypothetical question could work if he would also be off task 33% of the time due to pain. (Tr. 97–98). Smith testified that such an individual could not work, as the threshold for off-task time was 10%. (Tr. 98). Finally, the ALJ asked if the individual

described in the first hypothetical question could work if he had to take two unscheduled 15-minute breaks, beyond the normal breaks and lunch period, due to pain and fatigue. (Tr. 98). Smith said that such an individual could not work. (Tr. 98).

Roxanne Benoit, a VE, testified at the May 17, 2017, ALJ hearing. (Tr. 67–68). Hobbs' attorney asked Benoit if a hypothetical individual could work at the light level, if he could lift and carry no more than 10 pounds at maximum, walk for one hour at a time, sit for a half-hour before needing to alternate position, never reach overhead, and frequently reach in other directions. (Tr. 67). Benoit stated that such an individual could work at the sedentary level and could not perform any work at the light level. (Tr. 67–68).

## IV.     The ALJ's Decision

On May 17, 2017, the ALJ issued a decision determining that Hobbs was not disabled and denying his applications for supplemental security income and disability insurance benefits. (Tr. 15–46). The ALJ first noted that Hobbs had filed a previous application covering a period between 2009 and August 28, 2012, and that he had not shown good cause for reopening that application, which was denied. (Tr. 16). The ALJ also noted that Hobbs had insured status only through December 31, 2012, and, thus, had to show he was disabled on or before that date to receive disability insurance benefits. (Tr. 17, 19). The ALJ found that Hobbs had "the following severe impairments: degenerative disc disease of the lumbar spine, degenerative joint disease of the bilateral shoulders, degenerative joint disease of the right knee, bilateral sensorineural hearing loss, and hepatitis-C." (Tr. 19). The ALJ determined that Hobbs had no impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (Tr. 22–23).

The ALJ determined that Hobbs had the RFC to perform light work, except that he:

Cannot climb ladders ropes or scaffolds; can occasionally kneel and crawl; Cannot reach overhead bilaterally; Must avoid workplace hazards such as

19

unprotected heights and exposure to dangerous moving machinery; Can work in environments with no more than "Moderate" noise intensity level, defined to mean business offices where typewriters are used, department stores, grocery stores, light traffic, and fast-food restaurants during off-hours; and Can have occasional interactions with others.

(Tr. 23).

In assessing Hobbs' RFC, the ALJ explicitly stated that he "considered all symptoms" in light of the medical and other evidence in the record. (Tr. 24). The ALJ noted that Hobbs alleged that: (1) his shoulder, back, and knee pain prevented him from reaching above his head and in front of his body and lifting more than 10 pounds or a gallon of milk; (2) his arms and shoulders constantly hurt; and (3) his pain got worse if he walked "a couple of blocks" or stood for one hour. (Tr. 24–25). The ALJ stated that Hobbs' medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the ALJ found that Hobbs' complaints regarding the intensity, persistence, and limiting effects of his symptoms were "not entirely consistent with the medical evidence and other evidence in the record." (Tr. 25).

The ALJ explained that Hobbs' subjective complaints were inconsistent with medical records showing that: (1) Hobbs' medical history was more limited than would be expected in light of his complaints, including first complaining of left shoulder pain in July 2013, first complaining of bilateral shoulder pain in January 2015, not receiving treatment from September 2013 through November 2014, and first complaining of his back pain in July 2016; (2) he did not comply with several physicians' recommendations for physical therapy for his shoulders and had only limited physical therapy for his back; (3) his pain symptoms were adequately managed and improved with conservative treatment, including injections and medication; (4) he had nearly full strength in his shoulders, arms, knees, and back; and (5) diagnostic imaging and examination findings showed only mild to moderate problems in his shoulders, knees, and back. (Tr. 25–35,

38).  Further, the ALJ stated that Hobbs' subjective complaints were inconsistent with his reported daily activities and informal work activities, including: showering, dressing (with some reaching difficulty), cooking with a microwave, doing laundry, cutting grass, riding his bike, "tinkering with" and painting furniture, carpentry, climbing ladders, helping at stores, working on lawnmowers.  (Tr. 39–40).  The ALJ also noted that Hobbs appeared to try to bolster the evidence supporting his subjective complaints by misrepresenting to Dr. Vogelgesang and testifying that he was given narcotic pain relievers, when his medical records indicated that his physicians told him to stop "self-medicating" with narcotic pain relievers he received from his cousin and off the street.  (Tr. 38).

The ALJ noted that although Dr. Lippitt had a treating relationship with Hobbs (Tr. 41), his opinion was not due controlling weight because it was inconsistent with physical examinations that did not show Hobbs had progressive weakness in his arms or shoulders, Hobbs' daily activities, his informal work activities, and his statements that he was "very functional" after conservative treatment.  (Tr. 41).  Further, the ALJ stated that Dr. Lippitt's opinion was due little weight for the same reasons, and because: (1) Dr. Lippitt had seen Hobbs only once for a second opinion encounter; (2) his opinion was inconsistent with other medical records that did not find similar lifting restrictions and his own notes showing nearly full strength in Hobbs' shoulders and elbows; and (3) Hobbs' conservative care for his shoulder pain.  (Tr. 41).

The ALJ stated that Dr. Vogelgesang's opinion also was due little weight for many of the same reasons he had expressed in limiting the weight assigned to Dr. Lippitt's opinion.  (Tr. 41).  Further, the ALJ explained that Dr. Vogelgesang's opinion was inconsistent with his unremarkable objective findings on physical examinations, his findings that Hobbs had only slightly reduced strength in his shoulders, Hobbs' reports that he improved with injections and

oral pain medications, and Hobbs' reported daily living and work activities. (Tr. 41–42). Moreover, the ALJ noted that Dr. Vogelgesang's opinion that Hobbs was limited to light to sedentary work was incomplete, because he did not evaluate Hobbs' knee and back impairments or his alleged walking and standing limitations. (Tr. 42).

The ALJ stated that the state agency consultants' opinions were due great weight because they were consistent with: (1) the objective medical findings showing only mildly decreased strength in the shoulders and some limited range of motion; and (2) the supplemental medical records submitted at the hearing level. (Tr. 43). The ALJ also explained that the state agency consultants' evaluations were particularly reliable due to their expertise and familiarity with the Social Security regulations for evaluating a claimant's RFC. (Tr. 43). Nonetheless, the ALJ stated that the state agency consultants' opinions that Hobbs was limited from frequent stooping and crouching were due "less weight" because they were not supported by the medical evidence as a whole. (Tr. 43).

The ALJ noted that Hobbs turned 50 on September 7, 2014, and remained a person closely approaching advanced age as of the date of the decision. (Tr. 44). The ALJ noted that, if Hobbs were able to perform the full range of light work, the Medical Vocational Guidelines would direct a finding of not-disabled. (Tr. 45). However, because Hobbs had additional limitations, the ALJ relied on the VE's testimony to determine whether Hobbs could perform a significant number of jobs. (Tr. 45). Based on the VE's testimony and considering Hobbs' RFC, age, education, and experience, the ALJ found that Hobbs could work as a marker, office helper, or office cleaner. (Tr. 45). He noted that he accepted the VE's testimony that none of those jobs would require Hobbs to reach overhead, because it was based on the VE's years of professional experience in vocational rehabilitation. (Tr. 45–46). In light of his findings, the ALJ determined

that Hobbs was not disabled from August 28, 2012, through the date of his decision and denied Hobbs' applications for supplemental security income and disability insurance benefits. (Tr. 46).

## V.     Law & Analysis

### A.     Standard of Review

The court's review is limited to determining whether the ALJ applied proper legal standards and reached a decision supported by substantial evidence. 42 U.S.C. §§ 405(g) and 1383(c)(3); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion. *Rodgers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Under this standard of review, a court cannot decide the facts anew, make credibility determinations, or re-weigh the evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3) (providing that, if the Commissioner's findings as to any fact are supported by substantial evidence, those findings are conclusive); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) ("Upon review, we are to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor when testifying."). Even if the court does not agree with the Commissioner's decision, or substantial evidence could support a different result, the court must affirm if the Commissioner's findings are reasonably drawn from the record and supported by substantial evidence. *See Elam*, 348 F.3d at 125 ("The decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."). This is so because the Commissioner enjoys a "zone of choice" within which to

23

decide cases without risking being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Though the court's review is deferential, the court will not uphold the Commissioner's decision if the ALJ failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, however, we review decisions of administrative agencies for harmless error. Accordingly, . . . we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (citations and quotation omitted)). Furthermore, the court will not uphold a decision, even when supported by substantial evidence, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to supplemental security income or disability benefits: (1) whether

the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P; (4) if not, whether the claimant can perform her past relevant work in light of her RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(i)–(v) and 416.920(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).  The claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled and, thus, entitled to benefits.  20 C.F.R. §§ 404.1512(a) and 416.912(a).

### B.     Medical Opinions

Hobbs argues that the ALJ failed to apply proper legal procedures and reach a conclusion supported by substantial evidence in weighing the medical opinion evidence.  ECF Doc. 14, Page ID# 996–1001.  Specifically, Hobbs asserts that the ALJ improperly gave little weight to examining physicians Dr. Lippitt's and Dr. Vogelgesang's opinions regarding the limitations caused by his impairments.  *Id.* at 996–97.  He contends that Dr. Lippitt's and Dr. Vogelgesang's opinions were due great weight because Dr. Lippitt was an orthopedic surgeon, both had examined Hobbs, and Hobbs' treatment notes, including diagnostic imaging, supported their opinions.  *Id.* at 997–1001.  Further, Hobbs argues that the ALJ should not have given great weight to the state agency consultants' opinions or concluded that their opinions were consistent with Hobbs' MRI results showing the full extent of his shoulder issues, in part because their opinions were issued before Hobbs had his MRI revealing more extensive shoulder damage.  *Id.* at 997, 1000–01.

The Commissioner responds that the ALJ applied proper legal procedures and reached conclusions supported by substantial evidence in evaluating the medical opinion evidence.  ECF

Doc. 16, Page ID# 1023–27, 1029.  The Commissioner argues that the ALJ reasonably gave great weight to the state agency consultants' opinions after explaining that their opinions were supported by diagnostic imaging studies of Hobbs' shoulders, the June 2015 ENT consultation findings, and the consultants' expertise in Social Security programs.  *Id.* at 1023.  Further, the Commissioner asserts that the ALJ adequately considered the entire record in evaluating the state agency consultants' opinions and noted that their opinions were consistent with Hobbs' May 2016 MRI results.  *Id.* at 1024.  Finally, the Commissioner argues that the ALJ properly gave Dr. Lippitt's and Dr. Vogelgesang's opinions little weight, because: (1) Dr. Lippitt had only examined Hobbs once; (2) their opinions conflicted with their own treatment notes and other medical evidence; and (3) their opinions conflicted with Hobbs' daily activities and informal work activities.  *Id.* at 1024–27.

Hobbs replies by repeating his argument that the ALJ erred by not evaluating Dr. Lippitt's opinion as a treating source opinion, and by giving little weight to Dr. Lippitt's and Dr. Vogelgesang's opinions.  ECF Doc. 17, Page ID# 1034–35.  Hobbs asserts that Dr. Vogelgesang's treatment notes supported his opinion, and that this court should disregard the Commissioner's arguments supporting the ALJ's decision to give little weight to Dr. Lippitt's and Dr. Vogelgesang's opinions as improper *post hoc* rationalizations.  *Id.* at 1035–36.  Further, Hobbs reiterates his argument that the ALJ erred in giving great weight to the state agency consultants' opinions, because regulations require treating and examining physicians' opinions to be given greater weight than non-examining physicians' opinions.  *Id.* at 1036.

At Step Four, an ALJ must weigh every medical opinion that the Social Security Administration receives.  20 C.F.R. §§ 404.1527(c), 416.927(c).  An ALJ must give a treating physician's opinion controlling weight, unless the ALJ articulates good reasons for discrediting that opinion.  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).  "Treating-

source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Id.* (Quoting 20 C.F.R. § 404.1527(c)(2)). Good reasons for rejecting a treating physician's opinion may include that: "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *See Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (quotation omitted); 20 C.F.R. §§ 404.1527(c), 416.927(c). Inconsistency with nontreating or nonexamining physicians' opinions alone is not a good reason for rejecting a treating physician's opinion. *See Gayheart*, 710 F.3d at 377 (stating that the treating physician rule would have no practical force if nontreating or nonexamining physicians' opinions were sufficient to reject a treating physician's opinion).

If an ALJ does not give a treating physician's opinion controlling weight, he must determine the weight it is due by considering the length of the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. *See Gayheart*, 710 F.3d at 376; 20 C.F.R. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6). Nothing in the regulations requires the ALJ to explain how he considered each of the factors. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). But the ALJ must provide an explanation "sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376; *see also Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight he actually assigned."). When the ALJ fails to adequately explain the weight given to a

treating physician's opinion, or otherwise fails to provide good reasons for rejecting a treating physician's opinion, remand is appropriate. *Cole*, 661 F.3d at 939.

"[O]pinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'" *Gayheart*, 710 F.3d at 376. Instead, an ALJ must weigh such opinions based on: (1) the examining relationship; (2) the degree to which supporting explanations consider pertinent evidence; (3) the opinion's consistency with the record as a whole; (4) the physician's specialization related to the medical issues discussed; and (5) any other factors that tend to support or contradict the medical opinion. *Id.*; 20 C.F.R. §§ 404.1527(c), 416.927(c). Generally, an examining physician's opinion is due more weight than a nonexamining physician's opinion. 20 C.F.R. § 404.1527(c)(2), 416.927(c)(2); *Gayheart*, 710 F.3d at 375. An ALJ does not need to articulate good reasons for rejecting a nontreating or nonexamining opinion. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (declining to address whether an ALJ erred in failing to give good reasons for not accepting non-treating physicians' opinions). An ALJ may rely on a state agency consultant's opinion and may give such opinions greater weight than other nontreating physicians' opinions if they are supported by the evidence. *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 274 (6th Cir. 2015). Further, an ALJ may rely on a state agency consultant's opinion that predates other medical evidence in the record, if the ALJ considers any evidence that the consultant did not evaluate. *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009).

Notwithstanding the requirement that an ALJ consider and weigh medical opinion evidence, the ALJ is not required to give any deference to opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d). These issues include: (1) whether a claimant has an impairment or combination of impairments that meets or medically equal an impairment in the Listing of Impairments; (2) the claimant's RFC; (3) the application of

vocational factors; and (4) whether a claimant is "disabled" or "unable to work." 20 C.F.R. §§ 404.1527(d)(1)–(2), 416.927(d)(1)–(2).

The ALJ applied proper legal procedures in weighing Hobbs' medical opinion evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Elam*, 348 F.2d at 125; *Kinsella*, 708 F.2d at 1059. The ALJ complied with the regulations when he specifically stated that treating physician Dr. Lippitt's opinion was not due controlling weight, and explained that Dr. Lippitt's opinion was due little weight because: (1) it was inconsistent with Dr. Lippitt's and other physicians' physical examinations notes showing full strength in Hobbs' shoulders and elbows, Hobbs' daily activities and work activities, Hobbs' conservative treatment, and Hobbs' statements that he was "very functional" with conservative treatment; and because (2) Dr. Lippitt had seen Hobbs only once for a second opinion encounter. *Gayheart*, 710 F.3d at 376–77; 20 C.F.R. §§ 404.1527(c), 416.927(c); *Cole*, 661 F.3d at 938; (Tr. 41). Here, the ALJ's decision to assess Dr. Lippitt's opinion for controlling weight belies Hobbs' argument that the ALJ erred by not evaluating Dr. Lippitt's opinion a treating source. *Gayheart*, 710 F.3d at 375–76; (Tr. 41). The ALJ also complied with the regulations when he explained that consulting physician Dr. Vogelgesang's opinion was due little weight because it was inconsistent with his own examination notes, Hobbs' reports that he improved with conservative care, and Hobbs' reported daily living and work activities. *Gayheart*, 710 F.3d at 376–77; 20 C.F.R. §§ 404.1527(c), 416.927(c); *Cole*, 661 F.3d at 938; (Tr. 41–42). Furthermore, the ALJ followed proper legal procedures in giving great weight to the state agency consultants' opinions, because: (1) the ALJ adequately explained that their opinions were consistent with the objective medical evidence and supported by the consultants' expertise; and (2) the ALJ considered all the evidence in the record, including the medical records submitted after the state agency consultants issued their opinions. *Reeves*, 618 F. App'x at 274; *McGrew*, 343 F. App'x at 32; (Tr. 43).

Substantial evidence also supported the ALJ's weighing of the medical opinion evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Elam*, 348 F. 2d at 125; *Kinsella*, 708 F.2d at 1059. Here, Dr. Lippitt's opinion – that Hobbs should avoid pushing, pulling, and lifting more than 10 pounds – was inconsistent with his own treatment notes showing that Hobbs had only 1/10 to 2/10 pain in his shoulders, no pain with overhead reaching, good shoulder strength (4/5 in the right and 4+/5 in the left), and only mild stiffness on cross-body reaching. (Tr. 836–38). Similarly, Dr. Vogelgesang's opinion – that Hobbs was limited to sedentary work – was inconsistent with his own notes showing that Hobbs could walk half a mile, could carry and lift 10 pounds, had an intact range of motion in his spine and extremities, had a normal gait, and had full strength in all extremities (4+/5 in his shoulders). (Tr. 870, 872, 875–76). Furthermore, Dr. Lippitt's and Dr. Vogelgesang's opinions were inconsistent with, and the state agency consultants' opinions were consistent with: (1) other medical records finding that Hobbs had full or good strength in his shoulders, only mild to moderate physical symptoms, a normal gait, and improvement through conservative treatment (injections, medications, and back physical therapy); (2) Hobbs' daily and informal work activities, including riding his bike, mowing lawns, repairing lawnmowers, painting and sanding furniture, laying hardwood flooring, climbing ladders, carpentry, walking up and down stairs, and doing laundry; and (3) Hobbs' statements that he was doing fine and felt "very functional." (Tr. 58, 60, 63, 81, 84–85, 87–89, 590, 592–95, 642, 644, 649, 653, 656, 659, 671, 682, 687, 717–18, 729, 731, 760, 772, 790, 792–94, 798, 802–04, 824, 831, 849, 853, 865, 874, 881–82, 885, 889–90, 894–95, 898–99, 901, 903–05, 908, 910, 914–15, 917–18). Thus, even if other evidence could support a different result, the ALJ's weight determinations fall within the Commissioner's "zone of choice" because they were reasonably drawn from the record. *Elam*, 348 F.3d at 125; *Rogers*, 486 F.3d at 241; *Mullen*, 800 F.3d at 545.

## C.      Subjective Symptom Complaints

Hobbs argues that the ALJ wrongly determined that his subjective symptom complaints were inconsistent with the record evidence.  ECF Doc. 14, Page ID# 1003.

The Commissioner responds that the ALJ thoroughly analyzed the record evidence and provided an adequate, detailed explanation for rejecting Hobbs' subjective symptom complaints. ECF Doc. 16, Page ID# 1017–19.  The Commissioner argues that evidence supported the ALJ's decision to reject Hobbs' subjective complaints, including: (1) medical records showing that Hobbs repeatedly failed to comply with his physician's physical therapy prescriptions; (2) notes indicating that Hobbs reported his conservative treatment through medication and injections helped and allowed him to function well; (3) Hobbs' ability to care for his personal hygiene, shop, cook, clean his house, paint furniture, ride his bicycle, mow grass, and do laundry; and (4) Hobbs' reported work activities involving laying flooring, climbing ladders, sanding tables, working on lawn mowers, helping at convenience and liquor stores, and doing carpentry.  *Id.* at 1017–23.

Hobbs replies that the ALJ erred in determining that he did not attend physical therapy, denied working since 2007, and engaged in daily activities that were inconsistent with his subjective complaints.  ECF Doc. 17, Page ID# 1033–34.  He asserts that he testified that he worked for an hour or two in 2015, he attended physical therapy for his back, he had difficulty showering and dressing himself, and his activities were restricted to watching TV, tinkering in his basement, and cooking in the microwave.  *Id.* at 1033–34.

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms.  *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989).  Nevertheless, an ALJ is not required to accept a claimant's subjective symptom complaints and may properly discount the claimant's testimony

about his symptoms when it is inconsistent with objective medical and other evidence. *See Jones*, 336 F.3d at 475–76; SSR 16-3p, 82 Fed. Reg. 49462, 49465 (Oct. 25, 2017) ("We will consider and individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence.").  In evaluating a claimant's subjective symptom complaints, an ALJ may consider several factors, including the claimant's daily activities, the claimant's efforts to alleviate his symptoms, and the type and efficacy of any treatment.  SSR 16-3p, 82 Fed. Reg. at 49465–66; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).

Here, the ALJ applied proper legal procedures and reached a conclusion supported by substantial evidence when he determined that Hobbs' statements regarding the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical and other evidence in the record.  42 U.S.C. §§ 405(g), 1383(c)(3); *Elam*, 348 F.3d at 125; *Kinsella*, 708 F.2d at 1059.  First, the ALJ applied the correct legal standard by assessing Hobbs' subjective symptom complaints based on their consistency with the medical and other evidence, and by articulating that Hobbs' complaints were not entirely consistent with the other evidence in the record.  *Jones*, 336 F.3d at 475–76; *Temples*, 515 F. App'x at 462; SSR 16-3p, 82 Fed. Reg. at 49465–66; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); (Tr. 24–40).  Further, substantial evidence supported the ALJ's determination that Hobbs' subjective symptom complaints were not entirely consistent with the other evidence in the record, which revealed that: (1) Hobbs consistently told treatment providers that his pain symptoms improved with injections and medication; (2) Hobbs' treatment providers generally found that his physical symptoms were

mild to moderate, he had good to full strength in his upper and lower extremities, and he had a normal gait; (3) Hobbs told: Dr. Sandhu that he did not have any pain reaching down, Dr. Lippitt that he had no pain reaching overhead, and Dr. Kennedy that he had no pain from performing normal daily activities; (4) Dr. Inkrott believed that Hobbs exaggerated his pain symptoms; (5) Hobbs could ride a bike, lay hardwood flooring, climb ladders, sand and paint furniture, repair lawn mowers, walk up and down stairs, and do his own laundry; (6) Hobbs was non-compliant with his physicians' recommendations that he commit to physical therapy for his shoulder pain; (7) physical therapy helped Hobbs' back pain improve; and (8) Hobbs told Dr. Klaus that he did not want to have shoulder surgery because he felt he was "very functional." (Tr. 58, 60, 63, 81, 84–85, 87–89, 590, 592–95, 642, 644, 649–50, 653, 656, 659, 663–64, 668, 671, 673, 682, 687, 717–18, 729, 731, 760, 766, 772, 775, 790, 792–94, 798, 802–04, 815, 824, 830–33, 842–43, 849, 853, 855, 865,  874, 881–82, 885, 889–90, 894–95, 898–99, 901, 903–05, 908, 910, 914–15, 917–18).  Thus, the ALJ had a proper basis upon which to determine that the objective medical and other evidence did not confirm Hobbs' description of his symptoms; and this court may not disturb the ALJ's finding that Hobbs' subjective symptom complaints were not entirely consistent with the objective medical and other evidence in the record, even if one could lay out a basis for reaching a different result.  42 U.S.C. §§ 405(g), 1383(c)(3); *Jones*, 336 F.3d at 476; *Elam*, 348 F.3d at 125; *Rogers*, 486 F.3d at 241; *Blankenship*, 874 F.2d at 1123.

### D.    Improper Medical Judgment

Hobbs argues that the ALJ improperly made medical judgments when he disregarded Hobbs's treatment notes, MRIs, and X-rays to support his findings that Hobbs' subjective symptom complaints and Dr. Lippitt's and Dr. Vogelgesang's opinions were inconsistent with the medical record.  ECF Doc. 14, Page ID# 1000–01, 1003.  The Commissioner responds that the ALJ did not make improper medical findings, or "play doctor," but instead evaluated the

medical findings in the record to determine Hobbs' residual functional capacity, as required under the regulations. *Id.* at 1027–28. Hobbs replies that the ALJ made improper medical judgments when he evaluated whether Dr. Lippitt's and Dr. Vogelgesang's opinions were consistent with their own treatment notes. ECF Doc. 17, Page ID# 1035.

It is true that an ALJ "may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence." *Meece v. Barnhart*, 192 F. App'x 456, 465 (6th Cir. 2006); *see also Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (stating that "ALJs must not succumb to the temptation to play doctor and make their own medical findings). But an ALJ does not "play doctor" when the record is sufficiently developed, the ALJ reviews the medical opinion evidence in light of the record as a whole, and the ALJ makes a legal determination supported by substantial evidence. *Griffith v. Comm'r of Soc. Sec.*, 582 F. App'x 555, 562 (6th Cir. 2014). Further, an ALJ does not "play doctor" merely by deciding an issue reserved to the Commissioner, as ALJs are required to make such determinations under the regulations. *Cf.* SSR 96-5p, 61 Fed. Reg. 34471, 34472 (July 2, 1996) (explaining that issues reserved to the commissioner are not medical issues, but administrative findings dispositive to a social security case), *rescinded by* SSR 17-2p, 82 Fed. Reg. 15263–65 (Mar. 27, 2017).

Here, the ALJ did not "play doctor" by substituting his own judgment for that of the medical experts and Hobbs' physicians. Instead, the ALJ properly and exhaustively reviewed the medical and other evidence in the record, relied on that evidence in determining whether medical opinion evidence was supported, and determined the issues reserved to the Commissioner, including Hobbs' RFC. *Griffith*, 582 F. App'x at 562; SSR 96-5p, 61 Fed. Reg. at 34472; (Tr. 15–46). Thus, the record belies Hobbs' argument that the ALJ "played doctor."

## E.     Disability Determination

Hobbs argues that the ALJ improperly determined that he was able to perform work at the light exertional level, and that he was not disabled.  ECF Doc. 14, Page ID# 1004–06.  He asserts that, had the ALJ incorporated Dr. Lippitt's and Dr. Vogelgesang's opinions that he could not reach overhead and lift more than 10 pounds into the RFC, the VE's testimony would have supported a finding that he could not work at the light exertional level.  *Id.* at 1004–05.  Further, because the Medical Vocational Guidelines provide that a person over 50 years old who is limited to sedentary work is disabled, the ALJ should have found that he was disabled as of September 7, 2015.  *Id.* at 1005–06.

The Commissioner responds that, because the ALJ did not find Hobbs' allegations regarding the severity and limiting effects of his shoulder impairments to be consistent with the medical evidence, the ALJ was not required to incorporate those limitations into his RFC.  ECF Doc. 16, Page ID# 1030.  Because the ALJ relied upon the VE's testimony in response to a hypothetical question that tracked the ALJ's RFC finding, the Commissioner argues that the ALJ properly relied on the VE's testimony to conclude that Hobbs could perform a significant number of jobs.  *Id.* at 1029–30.

Hobbs replies that the ALJ "failed to follow the regulations when he disregarded any evidence which would have limited Hobbs to a sedentary level of exertion and/or found that he was unable to perform any work in the national economy."  ECF Doc. 17, Page ID# 1037.

At Step Four of the sequential analysis, the ALJ must determine a claimant's residual functional capacity or "RFC" by considering all relevant medical and other evidence.  20 C.F.R. §§ 404.1520(e), 416.920(e).  The RFC is an assessment of a claimant's ability to do work despite his impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 61 Fed. Reg. 34474, 34475 (July 4, 1996)).  "In assessing RFC,

the [ALJ] must consider limitations and restrictions imposed by *all* of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 61 Fed. Reg. at 34477. Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. § 416.929(a). A person with the RFC to perform light work can frequently lift up to 10 pounds, and may perform work that involves "a good deal of walking or standing, or . . . sitting with some pushing and pulling of arm or leg controls." 20 C.F.R. § 416.967(b).

At the final step of the sequential analysis, the burden shifts to the Commissioner to produce evidence supporting the contention that the claimant can perform a significant number of jobs in the national economy. *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). An ALJ may determine whether the claimant has the ability to perform work in the national economy by applying the medical-vocational guidelines. 20 C.F.R. §§ 404.1569, 416.969; 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00. The medical-vocational guidelines establish matrices that correlate variables— including the claimant's RFC, age, educational background, and previous work experience. *See generally* 20 C.F.R. Pt. 404, Subpt. P, App. 2. When these variables are entered into the appropriate matrix, a finding of disabled or not disabled is directed. *Id.* Nevertheless, the medical-vocational guidelines "do not cover all possible variations of factors." 20 C.F.R. § 416.969. When a claimant's particular characteristics do not coincide with a rule's corresponding criteria, such as when a claimant is unable to perform the full range of a category of work, the medical-vocational guidelines do not direct a conclusion of disabled or not disabled. 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(a), (d).

Age and education are vocational characteristics that affect a claimant's ability to work. 20 C.F.R. §§ 416.963(a), 416.964. A person under age 50 is classified as "younger," and a

person aged 50 to 54 is classified as "closely approaching advanced age." 20 C.F.R. §§ 404.1563(c)–(d), 416.963(c)–(d). A person with a 12th grade education or above is classified as having "high school education and above," and is generally considered to be able to do semi-skilled through skilled work. 20 C.F.R. §§ 404.1564(b)(4), 416.964(b)(4). The medical-vocational guidelines direct a finding of "not disabled" when a claimant is capable of performing the full range of light work and has limited or greater education, regardless of whether he is "closely approaching advanced age" or "younger." 20 C.F.R. Pt. 404, Subpt. P, App. 2 §§ 202.10–202.22.

Alternatively, an ALJ may determine that a clamant has the ability to adjust to other work in the national economy by relying on a vocational expert's testimony that the claimant has the ability to perform specific jobs. *Howard*, 276 F.3d at 238. A vocational expert's testimony in response to a hypothetical question is substantial evidence when the question accurately portrays the claimant's RFC. *See id.* (stating that "substantial evidence may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments" (internal quotation marks omitted)); *see also Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 715 (6th Cir. 2013) (unpublished) (stating that the ALJ's hypothetical question must "accurately portray[] a claimant's vocational abilities and limitations"). "An ALJ is only required to incorporate into a hypothetical question those limitations he finds credible." *Lee*, 529 F. App'x at 715; *see also Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990). ("If the hypothetical question has support in the record, it need not reflect the claimant's unsubstantiated complaints.")

Hobbs' challenge of the ALJ's RFC determination is unavailing. The ALJ applied proper legal procedures and reached a decision supported by substantial evidence in determining that

Hobbs had the RFC to perform a range of light work, notwithstanding his shoulder, back, and knee impairments. 42 U.S.C. §§ 405(g), 1383(c)(3); *Elam*, 348 F.3d at 125; *Kinsella*, 708 F.2d at 1059. Here, the ALJ followed proper legal procedures by considering all of Hobbs' impairments, severe or otherwise, in light of the medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1529(a), 416.920(e), 416.1529(a); SSR 96-8p, 61 Fed. Reg. at 34477; (Tr. 23–43). Evidence in the record supported the ALJ's determination that Hobbs could perform a range of light work, because the objective medical evidence indicated that he had good or full strength in his upper and lower extremities, could walk without assistance, and functioned well enough to perform normal daily living activities and various informal labor activities. (Tr. 60, 87–89, 582, 642, 644, 649, 653, 656, 659, 671, 682, 687, 717–18, 729, 731, 760, 765, 772, 775, 790, 792–94, 798, 802–04, 824, 831, 837, 849, 865, 872, 875–76, 885, 889–90, 894–95, 899, 901, 903–05, 908, 914–15, 917–18). Even though evidence showed that Hobbs had pain when reaching, other evidence showed that he was able to control his pain through conservative treatment and the ALJ controlled for his reaching limitations in the RFC. (Tr. 23, 58, 63, 81, 84–85, 642, 644, 653, 656, 659, 671, 687, 760, 790, 793, 802, 837, 901, 903). Further, because the ALJ did not find Dr. Lippitt's and Dr. Vogelgesang's opinions to be consistent with the medical record and other evidence, the ALJ was not required to incorporate their opinions into the RFC finding. *Lee*, 529 F. App'x at 715; *Blacha*, 927 F.2d at 231. Thus, this court cannot disturb the ALJ's conclusion that Hobbs could perform a range of light work, notwithstanding his shoulder, back, and knee impairments. 42 U.S.C. §§ 405(g), 1383(c)(3); *Jones*, 336 F.3d at 476; *Elam*, 348 F.3d at 125; *Rogers*, 486 F.3d at 241; *Walton*, 773 F. Supp. 2d at 747.

The ALJ also applied proper legal procedures and reached a conclusion supported by substantial evidence in determining that Hobbs was not disabled at Step Five. 42 U.S.C. §§ 405(g), 1383(c)(3); *Elam*, 348 F.3d at 125; *Kinsella*, 708 F.2d at 1059. Because the

medical-vocational guidelines do not direct a "disabled" finding when a claimant can perform light work and has a limited or greater education, regardless of whether he is "closely approaching advanced age" or "younger," and Hobbs was not capable of performing the full range of light work, the ALJ was permitted to rely on VE testimony to determine whether Hobbs was disabled. 20 C.F.R. §§ 404.1569, 416.969; 20 C.F.R. Pt. 404, Subpt. P, App. 2 §§ 200.00(a), (d), 202.10–202.22; *Howard*, 276 F.3d at 238; (Tr. 45–46). Further, because the ALJ's hypothetical to the VE directed the VE to consider Hobbs' age, education, and RFC as determined by the ALJ, the VE's testimony that Hobbs could work as a marker, office helper, or office cleaner was substantial evidence supporting the ALJ's conclusion that Hobbs could perform a significant number of jobs. *Howard*, 276 F.3d at 238; *Lee*, 529 F. App'x at 715; *Blacha*, 927 F.2d at 231; (Tr. 23–46, 94–99). Therefore, the ALJ properly concluded that Hobbs was not disabled under the Social Security Act and denied his applications for supplemental security income and disability insurance benefits, and this court may not disturb that decision. 42 U.S.C. §§ 405(g), 1383(c)(3); *Jones*, 336 F.3d at 476; *Elam*, 348 F.3d at 125; *Rogers*, 486 F.3d at 241.

**VI.     Conclusion**

Because the ALJ applied proper legal procedures and reached a decision supported by substantial evidence, the Commissioner's final decision denying Hobbs' applications for supplemental security income and disability insurance benefits is AFFIRMED.

IT IS SO ORDERED.

Dated: January 23, 2019

Thomas M. Parker
United States Magistrate Judge